

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD ASSOCIATION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | ) Case No. 99 C 6679<br>) |
| AMERICAN EXPRESS COMPANY, | )<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Blue Cross and Blue Shield Association owns trademarks on a family of "Blue" marks, including the term "Blue Card." In October 1999, Blue Cross filed suit against American Express for trademark infringement, dilution, and unfair competition and deceptive trade practices based on its use of "Blue" marks in connection with credit cards and related services. Blue Cross moved for a preliminary injunction against American Express' "Blue from American Express" credit card product, but the Court denied the motion. *Blue Cross and Blue Shield Ass'n v. American Express Co.*, No. 99 C 6679, 1999 WL 1044825 (N.D. Ill. Nov. 16, 1999). Blue Cross appealed the denial of the preliminary injunction, but before the appeal was heard, the parties entered into a settlement agreement in May 2000 which resolved the case.

The settlement agreement imposes various restrictions on American Express' use of the term "Blue." Among these is a prohibition which reads: "American Express shall not use the

1

word "Blue" on its credit cards." Pl. Ex. A ¶ 5. In March 2003, American Express introduced its "Blue Cash" credit card. The term "BLUE CASH" is printed on the lower right corner of the face of the credit card, and the word "blue" appears on the back of the card as part of a customer service telephone number: 1-888-blue-741.

In September 2004, Blue Cross filed a motion seeking to enforce the settlement agreement, alleging that American Express' adoption of the "Blue Cash" card violated the agreement, specifically the prohibition in paragraph five quoted above. Blue Cross seeks an order of specific performance barring American Express from using the card. American Express contends that the "Blue Cash" card does not violate the agreement; it argues that paragraph five prohibits it only from using the word "Blue" by itself, not in combination with other words or numbers. It also raises other defenses to Blue Cross's claim.

Both sides have moved for summary judgment. For the reasons stated below, the Court denies both motions.

## Discussion

In considering each party's motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party and draws reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may grant summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

1. **Paragraph five of the settlement agreement**

Construction of a settlement agreement is governed by ordinary contract law principles. *Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir. 1996); *Haisma v. Edgar*, 218 Ill. App. 3d 78, 87, 578

N.E.2d 163, 168 (1991). The touchstone of contract interpretation is to determine the contracting parties' intent. *See, e.g., In re Doyle,* 144 Ill. 2d 451, 468, 581 N.E.2d 669, 676 (1991). The parties' intent is determined from the plan and ordinary meaning of the language they used, unless the language is ambiguous. *Id.; see also, e.g., In re Estate of Powlus,* 315 Ill. App. 3d 859, 863, 734 N.E.2d 111, 115 (2002). Determination of whether a contract is facially ambiguous is a question of law. *See Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999).

Blue Cross argues that the sentence "American Express shall not use the word 'Blue' on its credit cards" means exactly what it says, that is, it prohibits use of the word Blue in any way, shape, or form on American Express's credit cards. It would be that simple if the settlement agreement contained only this particular provision. But contractual terms are not construed in a vacuum. Words derive their meaning from context, and thus the context must be considered in determining what the words mean. *See Utility Audit, Inc. v. Horace Mann Svc. Corp.,* 383 F.3d 683, 687 (7th Cir. 2004); *Beanstalk Group, Inc. v. AM Gen'l Corp.,* 283 F.3d 856, 860 (7th Cir. 2002) ("Sentences are not isolated units of meaning, but take meaning from other sentences in the same document"). Thus, it is hornbook law that contracts are to be construed as a whole, *see, e.g., Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.,* 225 F.3d 876, 879 (7th Cir. 2000); they are to be read in a way that avoids rendering contractual terms mere surplusage, *see, e.g., Premier Title Co. v. Donahue,* 328 Ill. App. 3d 161, 166, 765 N.E.2d 513, 518 (2002); and the usage of different language to address parallel issues generally indicates that the parties intended different meanings. *Taracorp, Inc. v. NL Indus., Inc.,* 73 F.3d 738, 744-45 (7th Cir. 1996).

3

We turn, therefore, to the settlement agreement's other related terms. The agreement contains, in addition to paragraph five, three other prohibitions regarding American Express's use of "Blue." Paragraphs three through six read, in pertinent part, as follows:

> 3. American Express shall not apply to register *the terms "Blue" alone or "Blue Card,"* as a trade or service mark in the United States, Canada or Mexico.
>
> 4. In all advertising and promotion of American Express' "Blue" credit card services, American Express shall:
>
> > A. not use the expression 'Blue cardholder' (or 'Blue' followed immediately by another word beginning with 'card'), but may use expressions such as 'Blue credit cardholder' (where 'Blue' is separated from 'card' by another word);
> >
> > B. use its house mark AMERICAN EXPRESS and/or its "American Express Box Logo" (in which the name "American Express" appears), including: (a) prominently on any first page of any promotional, advertising or other printed materials distributed to consumers or other external entities and on the first page of any website; (b) in the visual and/or audio portions of any television promotions or commercials; and (c) in any radio commercials, for services it offers or in which the term "Blue" appears; in each case in a manner such that the overall commercial impression of the advertisement / promotion links the mark "Blue" with "American Express.
>
> ...
>
> 5. *American Express shall not use the word "Blue" on its credit cards.*
>
> 6. American Express *shall not use the term "Blue" alone or in combination with any other term(s)* to brand or identify health care or insurance products or services. The Association will not object to, or file an action against, American Express' use of the term: (1) "Blue" in the manner provided for in paragraph 4 for credit card services; or (2) "Blue from American Express" for credit card services. ... In addition, the Association will not object to American Express' communication that solely market ancillary health or medical-related products or services to American Express credit card holders generally, including Blue credit card holders, so long as such communications *do not use the term "Blue" alone or in combination with any other term(s)* to identify or brand such health or medical-related products or services and are not sent on stationary branded with the "Blue" name or Blue credit cards.

4

Pl. Ex. A (emphasis added).

To summarize the pertinent portions just quoted, paragraph three prohibits American Express from applying to register "the term[ ] 'Blue' alone" as a trademark; paragraph five prohibits it from using "the word 'Blue'" on its credit cards; and paragraph six prohibits it from using "the term 'Blue' alone or in combination with any other term(s)" to brand or identify health care products or services. Pl. Ex. A, ¶¶ 3, 5 & 6. Blue Cross reads paragraph five's reference to "the word 'Blue'" as having the same basic meaning as paragraph six's prohibition on use of "the term 'Blue' alone or in combination with any other term(s)" – that is, as banning American Express from using the word Blue on a credit card in any way, shape, or form. American Express reads paragraph five as having the same basic meaning as paragraph three's prohibition on use of "the term 'Blue' alone" – that is, as banning the use of Blue by itself, but not in combination with other terms.[1]

The Court's initial reaction is that *both* parties must be wrong. Blue Cross and American Express are each the epitome of the sophisticated contracting party, and they imposed prohibitions that used "Blue" in three different ways. Without more, that should indicate they intended three different (if only slightly different) meanings. *See Taracorp*, 73 F.3d at 744-45. But each side has proposed to read paragraph five as parallel to one of the other two disparate usages of "Blue" in the contractual prohibitions, and the Court is at a loss to come up with a third interpretation that would make sense. The Court thus looks to the agreement's remaining provisions to see if they provide a guide to which side's understanding of paragraph five is

---

[1] Paragraph three also bans one particular "combination" usage in a trademark registration: "Blue Card." Pl. Ex. A ¶ 3.

correct.

The parties agree that paragraph five concerns only the usage of " Blue" on the physical credit card itself. American Express points out that paragraph four, which concerns advertising of "American Express' 'Blue' credit card services," prohibits only the use of the expression "Blue cardholder" or other expressions in which "Blue" is followed immediately, without intervening words, by a word beginning with "card." Pl. Ex. A ¶ 4A. Thus the plain language of paragraph four allows American Express to run an advertisement that depicts a card precisely like the one that is at issue in this case – that is, a card using the phrase "BLUE CASH" on the front. If this is so – and Blue Cross does not suggest that it is not so – then, American Express argues, it would make no sense to construe paragraph five to prohibit the company from issuing that very card.[2] Contracts are to be read to avoid absurd results. *See, e.g., Foxfield Realty, Inc. v. Kubala*, 287 Ill. App. 3d 519, 524, 678 N.E.2d 1060, 1063 (1997); *McMahon v. Chicago Mercantile Exchange*, 221 Ill. App. 3d 935, 946, 582 N.E.2d 1313, 1320 (1991) ("Language, though seemingly plain and clear, will not bear a literal interpretation if this leads to an absurd result.").

On the other hand, this particular supposedly absurd result, it could be argued, is itself unrealistic. It is not particularly likely that American Express would create advertisements depicting a card that it could not issue. Viewed in that light, the parties might have believed that a broad prohibition on the use of "Blue" in any way on credit cards would, in a practical sense, confine American Express's advertising in ways beyond the specific prohibitions included in

---

[2] Paragraph two, the trademark registration prohibition, likewise would permit American Express to register the mark "Blue Cash" for use in connection with credit card services.

paragraph four of the agreement.

In addition, American Express's proposed interpretation of paragraph five as prohibiting only the use of "Blue" by itself would permit the company to use on a credit card the phrase "Blue Card," which is covered by paragraph two's trademark registration ban, and which even American Express seems to agree was the main focus of Blue Cross's concern. *See* Def. Mem. in Opp. at 13. A construction that would prohibit American Express from registering the mark "Blue Card" but would allow American Express to use that mark on a credit card is arguably no less unreasonable than the example cited by American Express.

In sum, consideration of the remainder of the contract does not indicate clearly point to one side's construction as inherently more reasonable than the other's. Our conclusion is that paragraph five is ambiguous. *See, e.g., Platt v. Gateway Int'l Motorsports Corp.*, 351 Ill. App. 3d 326, 330, 813 N.E.2d 279, 283 (2004) (A contract is ambiguous if the language used is susceptible of more than one reasonable meaning or is obscure in meaning through indefiniteness of expression).

This ambiguity permits the Court to consider extrinsic evidence to determine the meaning of the contractual term. Construction of an ambiguous contract is a question of fact. *Pepper Construction Co. v. Transcontinental Ins. Co.*, 285 Ill. App. 3d 573, 576, 673 N.E.2d 1128, 1130 (1996). The Court may determine the construction of an ambiguous contract without a trial only if "a reasonable person could reach only one conclusion" about the meaning of the ambiguous language. *See Nat'l Diamond Syndicate, Inc. v. United Parcel Svc., Inc.*, 897 F.2d 253, 262 (7th Cir. 1990).

Most of the extrinsic evidence offered by the parties is subjective, and not surprisingly, it

points in different directions. Blue Cross's personnel have testified that their primary goal was to avoid the use of the word "Blue" on American Express's cards, and that they understood paragraph five accordingly; American Express's personnel have testified that they understood that provision to be aimed only at the use of the word "Blue" by itself. The Court need not review this evidence in detail. It will suffice to say that the subjective extrinsic evidence gives rise to factual and inferential disputes that the Court cannot properly resolve in the summary judgment context.

The parties identify only two areas of objective extrinsic evidence. The drafting history of paragraph two, the trademark registration prohibition, arguably suggests that when the parties prohibited use of the term "Blue," they were referring to the use of that word by itself. Specifically, a draft of the agreement prepared by Blue Cross proposed a prohibition on registration of "the terms 'Blue,' 'Blue Card,' or 'Blue' in combination with any other term." Def. Ex. 4. The same draft included the prohibition on use of "the word 'Blue' on [American Express's] credit cards" that ended up as paragraph five. If these usages of "Blue" are read consistently, this evidence is supportive of American Express's construction of paragraph five. On the other hand, American Express added the word "alone" to paragraph two in a later draft, arguably suggesting that without that addition, a prohibition on use of the word "Blue" did not simply bar use of that word by itself. Pl. Ex. L ¶ 3. This evidence does not permit resolution of the dispute on summary judgment.

American Express also relies on evidence of the parties' conduct as indicative of the

purpose of paragraph five.[3] Under Illinois law, the parties' actions under a contract "is often the strongest evidence of their intended meaning." *Chicago & North Western R. v. Peoria & Pekin Union R.*, 46 Ill. App. 3d 95, 101, 360 N.E.2d 404, 407 (1977); *see Nat'l Diamond Syndicate*, 897 F.2d at 261 (court may look to parties' conduct to determine their understanding of contractual term). At the time the parties executed the settlement agreement, American Express's card already included the term "Blue" in one of the same usages now deemed offending by Blue Cross: in the customer service telephone number printed on the back of the card. Following the execution of the agreement, American Express took no steps to alter that aspect of its card, and Blue Cross took no steps to insist that American Express change that particular usage. The parties' actions suggest that the settlement agreement was not intended to disturb American Express's use of "blue" as part of another phrase (in this instance, the phrase consisted of numbers) and thus should not be interpreted to prohibit "Blue" when used in combination with other terms. On the other hand, there is evidence that would permit a finding that Blue Cross's inaction represented not tacit assent but rather a combination of trust and lack of knowledge.

In sum, the Court finds that the contractual provision relied upon by Blue Cross is ambiguous and that its meaning cannot be resolved as a matter of law. A trial will be necessary to permit the Court construe the contract.[4]

**2.    Remedy**

---

[3] American Express cites this evidence under the general rubric of extrinsic evidence to be considered upon determination that the agreement is ambiguous. Def. Mem. in Opp. at 13.

[4] Because Blue Cross requests only the equitable remedy of specific performance, the trial will be a bench trial.

9

American Express contends that even if Blue Cross can show a breach of paragraph five of the agreement, it cannot establish the elements necessary to obtain an injunction. The Court disagrees.

First, the Court rejects American Express's argument that Blue Cross must establish the elements necessary to obtain an injunction for trademark infringement. American Express is not entitled to ignore the settlement agreement that it executed and require Blue Cross to return to square one. The public policy favoring settlements would be undermined if Blue Cross had to meet the same burden that would be imposed if there had not been a settlement agreement to begin with.

"A motion to enforce a settlement agreement is essentially the same as a motion to enforce a contract." *Capri Sun, Inc. v. Beverage Pouch Systems, Inc.*, No. 97 C 1961, 2000 WL 1036016, *2 (N.D. Ill. July 21, 2000). Thus, enforcement of a settlement agreement is governed by state contract law. *Laserage Technology Corp. v. Laserage Lab., Inc.*, 972 F.2d 799, 902 (7th Cir. 1992); *Solar v. Weinberg*, 274 Ill. App. 3d 726, 731, 653 N.E.2d 1365, 1368 (1995).

Blue Cross is asking the Court to enforce a negative covenant in the settlement agreement. An action to enforce a negative covenant is, in substance, an action for specific performance. *George F. Mueller & Sons, Inc. v. Morales*, 25 Ill. App. 3d 466, 469, 323 N.E.2d 518, 520 (1978). To obtain an order of specific performance, Blue Cross must show that it had a valid, binding, and enforceable contract with American Express; that Blue Cross complied with the contract; that American Express failed to perform; and that Blue Cross lacks an adequate remedy at law. *McCormick Road Ass'n L.P. II v. Taub*, 276 Ill. App. 3d 780, 783, 659 N.E.2d 52, 54 (1995); *Landers v. Fronczek*, 177 Ill. App. 3d 240, 245, 532 N.E.2d 265, 268 (1989);

*George F. Mueller & Sons*, 25 Ill. App. 3d at 470, 323 N.E.2d at 521.

American Express does not dispute that the agreement is valid, binding, and enforceable, or that Blue Cross complied with the agreement. The issue of American Express's performance remains for trial, as it depends upon the construction of paragraph five. American Express contends that even if Blue Cross can establish a breach, it cannot prove that it lacks an adequate remedy at law. A party lacks an adequate remedy at law when money damages will not suffice to remedy the contractual breach, such as when the measure of damages is uncertain or difficult to ascertain. *George F. Mueller & Sons*, 25 Ill. App. 3d at 470, 323 N.E.2d at 521.

American Express has failed to establish that Blue Cross cannot prove that its remedy at law is inadequate. Though, as the Court has discussed, Blue Cross need not establish the elements that it would have to demonstrate were this a trademark infringement action, trademark cases are instructive with regard to the adequacy of a damage remedy: as in a trademark case, Blue Cross claims a right to exclude another party from the use of a term that has commercial value to Blue Cross. The law is clear that the injury caused by the infringement of a trademark is "by [its] very nature irreparable and not susceptible of adequate measurement for remedy at law," making equitable relief appropriate. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1998) (quoting *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982)). In the present case, where the allegedly injured party has a settlement agreement containing a negative covenant prohibiting use of a term, equitable relief in the form of an order for specific performance likewise is the appropriate remedy. *See* 5 T. McCarthy, McCarthy on Trademarks § 30:2 (4th ed. 2005) ("The remedy of injunction may also be appropriate in its guise of an order for specific performance of a contract, such as a settlement

11

contract's promise not to use a trademark."); *see also Dunhill Ltd. v. Dunhill Compact Classics Inc.*, No. 88-5584, 1988 WL 391507, 11 U.S.P.Q.2d 1078, 1080 (C.D. Cal. Dec. 28, 1988) (ordering specific performance of settlement agreement dealing with trademarked terms).

3.  **Laches**

American Express argues that even if it did breach the agreement, Blue Cross's claim is barred by the doctrine of laches. The equitable defense of laches "addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). The defense of laches requires American Express to show a lack of due diligence by Blue Cross and resulting prejudice to American Express. *Jameson Realty Group v. Kostiner*, 351 Ill. App. 3d 416, 431-32, 813 N.E.2d 1124, 1137 (2004).

American Express advances two main arguments in support of its argument that Blue Cross knowingly slept on its right to bring an action for breach of paragraph five of the settlement agreement. First, it is undisputed that Blue Cross knew prior to the signing of the Agreement that American Express used the word "blue" in its customer service telephone number printed on the back of the credit card (1-888-blue-741). Taffe Dep. at 27, 33. Indeed, one of the reasons Blue Cross decided to bring its original action against American Express in 1999 was the use of "blue" in the telephone number on the credit card. *Id.* As the Court has discussed, Blue Cross contends that paragraph five prohibits American Express from using "blue" in the phone number printed on the card. But after signing the Agreement, American Express never stopped using "blue" in the telephone number printed on the card. Blue Cross did not accuse American Express of breaching paragraph five until July 2004, over four years after the agreement was signed.

American Express' second argument is based on the fact that it began printing the term "BLUE CASH" on the front of its credit card in March 2003, but Blue Cross made no claim until July 2004 that this breached the agreement. Blue Cross says that it was unaware of the use of "BLUE CASH" on the front of the card until April 2004, when Heather Steinmeyer, an executive at Blue Cross, received a mailing from American Express that featured a picture of the front of the card. Blue Cross claims that it investigated the issue from April 2004 until July 2004, when it sent American Express a letter accusing it of breaching the Agreement.

Blue Cross argues that a delay of four months is insufficient to support a laches defense. *See City of Chicago v. Alessia*, 348 Ill. App. 3d 218, 230, 807 N.E.2d 1150, 1160 (2004) (holding that a delay of two months did not support a laches defense). American Express contends that the operative period is the delay between March 2003 and July 2004. According to American Express, it began printing cards with "BLUE CASH" on the front in April 2003. Mee Dep. at 21. At the same time, it began a massive advertising campaign for the "Blue Cash" credit card. All "Blue Cash" advertising in 2003-04 contained a representation of the credit card with the words "BLUE CASH" in the lower right corner. American Express claims that it began advertising in Chicago in September 2003. *See* Marryat Decl. ¶¶ 7-11. Kathleen Marryat, the Vice President of American Express Interactive, worked on the "Blue Cash" advertising campaign. She claims there were ads depicting "the front of the BLUE CASH credit card with the mark BLUE CASH in the lower right-hand corner, which were placed in high traffic areas in downtown Chicago, an on bus kiosks and exteriors of trains, taxis and buses throughout the city." *Id.* ¶ 10. Marryat claims that one such advertisement was placed in close proximity to Blue Cross headquarters. *Id.* ¶ 14. Furthermore, she claims that there were direct mailings to

approximately 1.4 million Chicago residents in 2003 and 2.9 million Chicago residents in 2004. American Express contends that it would have been virtually impossible for Blue Cross personnel not to have seen depictions of the card with "BLUE CASH" printed on it until April 2004.

Blue Cross points out that a plaintiff's delay for purposes of the doctrine of laches is significant only once the plaintiff "learns of the facts on which his rights are based or when a reasonable person would acquire such knowledge." *Collins v. Nugent*, 110 Ill. App. 3d 1026, 1042, 443 N.E.2d 277, 288 (1982). Blue Cross argues, and American Express concedes, that American Express presents no evidence that any Blue Cross employee realized that American Express was printing "BLUE CASH" on its credit cards before April 2004. Pl. Ex. in Opp. P at 21, 23, and 75. Blue Cross also asserts that it had no reason to suspect that American Express was not in compliance with the agreement and that American Express has not pointed to any event that should have suggested to Blue Cross that a breach was occurring. *See Neagle v. McMullen*, 334 Ill. 168, 180, 165 N.E. 605, 610 (1929) (no laches where the plaintiff did not have actual knowledge and no circumstances existed that would have caused the plaintiff to inquire about a breach). Finally, Blue Cross argues that it was justified in relying on American Express to follow the settlement agreement because it is a sophisticated company that can be assumed to have understood its obligations under the agreement. Pl. Ex. in Opp. D. at 43.

The argument regarding laches boils down to a dispute over the inferences to be drawn from the facts – in particular, when should Blue Cross reasonably have learned that American Express was continuing to print "blue" on the back of its credit cards and had begun to print "BLUE CASH" on the front of the cards? Viewing the available evidence in the light most

14

favorable to Blue Cross, the Court finds that there are genuine issues of fact that are material to American Express's laches defense. The matter can only be determined following a trial.

## Conclusion

For the reasons stated above, the Court denies both sides' motions for summary judgment [docket nos. 71, 101]. The case is set for a status hearing on August 1, 2005 at 9:30 a.m. Trial counsel are directed to appear.

MATTHEW F. KENNELLY
United States District Court

Date: July 25, 2005